# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF WASHINGTON
# AT SEATTLE

| | |
|---|---|
| D.S., and P.S., parents of P.S., a minor,<br><br>Petitioners,<br><br>v.<br><br>BAINBRIDGE ISLAND SCHOOL DISTRICT,<br><br>Respondent. | CASE NO. C20-5140 MJP<br><br>ORDER GRANTING PETITION FOR JUDICIAL REVIEW |

This matter comes before the Court on Petitioners' Petition for Judicial Review of an Administrative Law Judge's (ALJ) denial of claims under Individuals with Disabilities in Education Act (IDEA). (Dkt. No 17.) Having reviewed the opening brief (Dkt. No. 17), Respondent's opposition brief (Dkt. No. 20), the reply brief (Dkt. No. 21), and the administrative record, the Court GRANTS the Petition and REVERSES the ALJ's determination.

**BACKGROUND**

Petitioners filed a pro se complaint against the Bainbridge Island School District, asserting that the District violated the IDEA by failing to identify and evaluate their child, P.S.,

for a writing disability between April 25, 2017 and April 30, 2018. The claim spanned a time when P.S. was in the first grade (the 2016-2017 school year) and second grade (the 2017-2018 school year). And it was one of seven claims the Parents (or Petitioners) pursued against the District. After holding a five-day trial with live testimony, the ALJ denied all of the Parents' claims in a thirty-one-page order with findings of fact and conclusions of law. Administrative Record (AR) 999-1030. The Parents now appeal that order only as to the writing disability.

**A.      P.S.'s learning challenges and the District's assistance**

At an early age, P.S. was evaluated by the District for special education services. AR 1001. In 2013, the District crafted an Individualized Education Program (IEP) to address P.S.'s communication disorder. Id. After P.S.'s kindergarten year (2015-2016), the Parents expressed concerns about P.S.'s potential dyslexia and writing problems:

> [W]e would like [P.S.] tested for dyslexia. If nothing else . . . we rule it out. We've been working with him daily since school ended, and he writes many numbers/letters backwards. This is nothing new yet something he has done all year long. Before he starts 1st grade, we would like to know if this is an issue or not. If not . . . fantastic! If so, we can get him help asap."

AR 1334. The Parents received no offer from the District to evaluate P.S. and it was generally suggested that they could obtain this evaluation privately. Id.

The Parents then requested an evaluation of P.S. after he began the first grade in September 2016. AR 1338. But the teacher, Terra Claiborne resisted, suggesting in an email to the School Counselor, Karin Knight, that it "would not be a good use of our resources at this time." AR 1338. Instead, it appears that the teacher wanted to set goals for a general education intervention process and evaluate whether progress could be made before deciding whether to do a full evaluation. AR 1337. P.S. continued to show significant trouble with reading fluency during the school year. Id. An evaluation by the District's school psychologist, Milo Zaneski, was then ordered in early 2017.

Before the reevaluation, Claiborne, and the learning assistance program coordinator, Robyn Stahl, referred their concerns about P.S. to Knight in mid-January 2017. AR 1003, 1366. They identified the following: "concerns-READING, writing, and maybe Math." AR 1366 (capitalization in original). Knight relayed this information to Zaneski before his evaluation of P.S. AR 1003. But Knight's email was not shared with the Parents and no one apparently discussed it with the Parents during a multidisciplinary meeting with them in mid-February 2017. The parents did not identify writing as an area of concern at the time they consented to the reevaluation. AR 1004. After the multidisciplinary meeting, Zaneski prepared to evaluate P.S. in the areas of reading and cognition. AR 1003. After Zaneski completed the reevaluation, the District and Parents signed a new IEP dated April 25, 2017. AR 1391, 1398, 1403, 1405. The IEP targeted reading and speech but did not address writing as it was not evaluated. AR 1410-18.

During the second-grade school year, P.S.'s teacher, Teresa Ball, noted that P.S. "has dyslexic/graphic issues that may be contributing to his issues." AR 1441 (October 17, 2017). The Parents reported that P.S. was feeling embarrassed and overwhelmed by his dyslexia and its impacts on his reading, math and school in general. AR 1444. By December 2017, the Parents hired Dr. Stephanie Nelson, a board certified pediatric and clinical neuropsychologist to evaluate P.S. AR 1010. In January 2018, Dr. Nelson diagnosed P.S. with dyslexia, dysgraphia, and anxiety. AR 1494, 1536. Dr. Nelson found P.S. was a year behind peers in writing fluency, written expression, and single-word spelling. AR 1494. Dr. Nelson recommended "specialized instruction in writing, provided at least 2-3 days per week." AR 1495.

The Parents then provided Dr. Nelson's evaluation to the District on January 30, 2018. On February 5, 2018, Zaneski scheduled a multidisciplinary team meeting on February 28, 2018, but then delayed it until March 13, 2018. AR 1513-14. The meeting resulted in the inclusion of

writing as part of the evaluation, to which the parents consented. AR 1512, 1562. On April 30, 2018, the District completed its evaluation and found P.S. eligible for special education in writing. AR 1553, 1556-57. The revised IEP included 100 minutes a week of paraeducator support for writing in general education classes. AR 1574.

**B.     The ALJ's decision**

After P.S. moved to a private school, the Parents filed a pro se due process complaint on April 16, 2019 against the District. They challenged a number of the District's decisions, including its failure to assess and evaluate P.S.'s writing abilities. The ALJ dismissed all of the claims raised in the complaint and denied the requested relief.

As to the claim that the District failed to identify the writing disability earlier, the ALJ concluded that there had been no evidence warranting an evaluation "between April 16, 2017 and January 16, 2018." AR 1027. The ALJ also concluded that:

> the Parents have not alleged that the District failed to conduct a full evaluation that assessed the Student in all areas of suspected disability when Mr. Zaneski performed the April 16, 2017 Reevaluation. Timothy O., 822 F.3d at 1118. The Parents only allege that the District failed in its child find obligation between April 16, 2017 and January 16, 2018.

AR 1028 ¶ 49. In so concluding, the ALJ noted that "there are only three instances where District personnel encountered information regarding the Student's writing struggles." AR 1028 ¶ 50. The ALJ found all three inadequate to trigger the child-find duty. First, the ALJ rejected Claiborne and Stahl's identification of writing as a concern in January 2017 because "this referral occurred outside the statute of limitations in this case." AR 1028 ¶ 50. The ALJ noted further:

> Regardless, after the Parents and the District's multidisciplinary team met on February 16, 2017 to discuss concerns about the Student, the team determined that the Student's only area of concern was reading and that the Student was within the normal developmental range for writing.

AR 1028 ¶ 50. The ALJ provided no further explanation.

Second, the ALJ rejected Ball's concern in the Fall of 2017 about "dyslexia/graphia" as "an off-hand comment" and that Ball "is not trained to diagnose the Student with dysgraphia and was actually referring to the Student's general struggles with his reading disability and how it impacts his ability to complete double-digit math problems." AR 1028 ¶ 51.

Third, the ALJ noted that Ball, Pool, and P.S's mother mentioned writing as a concern in response to evaluations requested by Dr. Nelson as part of her comprehensive evaluation from January 2018. AR 1028 ¶ 52. The ALJ did not explain why this did not trigger a need to evaluate before April 2018.

The ALJ's decision focuses on Dr. Nelson's testimony about the interplay between dyslexia and dysgraphia to suggest that the District was not and could not have been on notice about P.S.'s writing disability before Dr. Nelson performed her evaluation. AR 1028-29 ¶¶ 54-56. Citing Dr. Nelson, the ALJ stated that "a writing disability like dysgraphia is secondary to a diagnosis of dyslexia and when educators address reading ability, writing generally improves along with reading ability." AR 1028 ¶ 55. The ALJ also suggested that Dr. Nelson "made her diagnosis [of dysgraphia] secondary to the Student's dyslexia diagnosis." AR 1028 ¶ 56. This bolstered the ALJ's opinion that the District's efforts to help P.S. with reading aided his writing. AR 1028-29 ¶¶ 50-56. The ALJ noted that P.S. was "within normal developmental range in writing given his age, grade level, and reading ability." AR 1028 ¶ 53. The ALJ believed that the District could not have identified the suspected writing disability earlier and that it provided "writing support . . . in the general education classroom in the same fashion" as Dr. Nelson ultimately recommended. AR 1029 ¶ 56. Setting aside all evidence that P.S.'s teachers and Parents noted his difficulty with writing, the ALJ concluded that "Dr. Nelson's comprehensive

neurological assessment of the Student that identified writing as an area of concern is the first time the District knew or should have known that the Student suffered from a writing disability such that an evaluation of the Student was warranted." AR 1029 ¶ 57. The ALJ concluded:

> Given the period of time at issue and the evidence in the record, it cannot be concluded that the District's child find obligations in the areas of writing was triggered prior to January 16, 2018, or that the District failed to conduct an appropriate evaluation after receiving Dr. Nelson's report. The Parents, then, have not met their burden and have not shown that the District violated the IDEA and denied the Student FAPE.

AR 1029 ¶ 58.

## ANALYSIS

**A.    Standard of review**

Under the IDEA, the district court is to "receive the records of the administrative proceedings;" "hear additional evidence at the request of a party;" and "grant such relief as the court determines is appropriate" based on a preponderance of the evidence. 20 U.S.C. § 1415(i)(2)(B). The burden of proof is on the party challenging the administrative ruling. Seattle School Dist., No. 1 v. B.S., 82 F.3d 1493, 1498 (9th Cir. 1996). The Court does not perform a de novo review. Ojai Unified Sch. Dist. v. Jackson, 4 F.3d 1467, 1471 (9th Cir. 1993). The Court is instructed instead to give "due weight . . . to these proceedings" and may not "substitute [its] own notions of sound educational policy for those of the school authorities which [it] review[s]." Bd. of Educ. v. Rowley, 458 U.S. 176, 206 (1982).

"How much deference to give state educational agencies . . . is a matter for the discretion of the courts." Gregory K. v. Longview Sch. Dist., 811 F.2d 1307, 1311 (9th Cir. 1987) (emphasis in original); see Ojai, 4 F.3d at 1471 (noting that traditional agency deference does not apply). The court must consider the findings carefully and endeavor to respond to the hearing officer's resolution of each material issue. Capistrano Unified School Dist. v. Wartenberg, 59 F.3d 884, 891 (9th Cir. 1995). The Court is not permitted to simply ignore the administrative

findings. Gregory K., 811 F.2d at 1311. But after a careful consideration of the hearing officer's decision, the court is free to accept or reject the findings in whole or in part. Id.

**B.     IDEA standards**

The IDEA was created to "ensure that all children with disabilities have available to them a free and appropriate public education [FAPE] that emphasizes special education and related services designed to meet their unique needs and prepare them for further education, employment and independent living." 20 U.S.C. § 1400(d)(1)(A). School districts must assess any suspected disabilities, 20 U.S.C. § 1414, and then craft an individualized education program (IEP) "reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances." Endrew F. v. Douglas Co. Sch. Dist., __ U.S. __, 137 S.Ct. 988, 999, 197 L.Ed.2d 335 (2017).

"[A] state must comply both procedurally and substantively with the IDEA." M.L. v. Fed. Way Sch. Dist., 394 F.3d 634, 644 (9th Cir. 2005) (citing Rowley, 458 U.S. 206–07). Parents may thus challenge the school district's procedural and substantive compliance with the IDEA. See N.B. v. Hellgate Elementary Sch. Dist., 541 F.3d 1202, 1207 (9th Cir. 2008). Here, the parents challenge only procedural compliance, claiming the District failed to evaluate P.S.'s suspected writing disability.

Procedural compliance requires the district to assess any suspected disability, known as the "child-find" requirement. "In order to provide a free appropriate public education to all children with disabilities States must, of course, first identify those children and evaluate their disabling conditions." Timothy O. v. Paso Robles Unified Sch. Dist., 822 F.3d 1105, 1110 (9th Cir. 2016). "Once identified, those children must be evaluated and assessed for all suspected disabilities so that the school district can begin the process of determining what special education

and related services will address the child's individual needs." Id. (citing 20 U.S.C. §§ 1412(a)(7), 1414(a)-(c)). "That this evaluation is done early, thoroughly, and reliably is of extreme importance to the education of children . . . [because o]therwise, many disabilities will go undiagnosed, neglected, or improperly treated in the classroom." Id. (citing 20 U.S.C. § 1400(c)). The duty to assess all areas of suspected disability extends to reevaluations for children with existing IEPs. 20 U.S.C. § 1414(a)(2)(A). When conducting the evaluation, "[t]he school district must, therefore, 'ensure that— . . . the child is assessed in all areas of suspected disability.'" Timothy O., 822 F.3d at 1111 (quoting 20 U.S.C. § 1414(b)(3)(B)) (emphasis in original). "Anything less would not provide a complete picture of the child's needs." Id.

"The IDEA requires that, if a school district has notice that a child has displayed symptoms of a covered disability, it must assess that child in all areas of that disability using the thorough and reliable procedures specified in the Act." Timothy O., 822 F.3d at 1118–19. "[A] disability is 'suspected,' and therefore must be assessed by a school district, when the district has notice that the child has displayed symptoms of that disability." Id. at 1119. The duty to assess can be triggered by the "informed suspicions of parents, who may have consulted outside experts" even if the school disagrees. See Pasatiempo by Pasatiempo v. Aizawa, 103 F.3d 796, 802 (9th Cir. 1996); N.B., 541 F.3d at 1209-10 (noting that the duty may also by triggered by the informed suspicions of outside experts). "[N]otice may come in the form of expressed parental concerns about a child's symptoms, as in Pasatiempo, of expressed opinions by informed professionals, as in Hellgate, or even by other less formal indicators, such as the child's behavior in or out of the classroom." Timothy O., 882 F.3d at 1121. "A school district cannot disregard a non-frivolous suspicion of which it becomes aware simply because of the subjective views of its staff, nor can it dispel this suspicion through informal observation." Id. Such "notice

automatically triggers mandatory statutory procedures: the school district must conduct an assessment for all areas of the suspected disability using the comprehensive and reliable methods that the IDEA requires." Id. at 1121-22.

If the parents demonstrate a procedural violation of the IDEA, they must also show that the procedural violation "result[ed] in the loss of educational opportunity, or seriously infringe the parents' opportunity to participate in the IEP formulation process, or that caused a deprivation of educational benefits." N.B., 541 F.3d at 1207 (citation and quotation omitted). "[P]rocedural inadequacies that result in the loss of educational opportunity, or seriously infringe the parents' opportunity to participate in the IEP formulation process, or that caused a deprivation of educational benefits, clearly result in the denial of a FAPE." Amanda J. ex rel. Annette J. v. Clark Cty. Sch. Dist., 267 F.3d 877, 892 (9th Cir. 2001) (citation and quotation omitted).

**C.     Procedural violation of the IDEA**

The Parents correctly argue that the District's failure to evaluate writing as part of the April 2017 reevaluation constituted a procedural violation of the IDEA. See Timothy O., 822 F.3d at 1121-22. The record shows that the District was on notice about concerns over P.S.'s writing abilities before performing the April 2017 reevaluation. On January 26, 2017, the District's certified school psychologist, Zaneski, received notice of P.S.'s teacher's concerns about reading and writing: "Concerns-READING, writing and maybe Math." AR 1366 (capitalization in original); see AR 1003 (noting Zaneski's role with the District). This should have prompted the District to evaluate not just reading, but also writing. See Timothy O., 882 F.3d at 1121. But Zaneski and the District failed to undertake any assessment of writing. The District was also aware of the Parents' concerns from June 2016 that P.S. was having trouble

with reading and writing, and yet took no action. AR 1334. The Court finds that the District's failure to evaluate writing amounts to a procedural violation of the IDEA because it should have acted on these nonfrivolous identifications of a suspected writing disability. See Timothy O., 882 F.3d at 1121-22.

The ALJ's decision improperly sets aside the teachers' concerns relayed to Zaneski. Nowhere does the ALJ discuss why Zaneski chose not to assess writing despite the teachers' concerns or why it was appropriate under the IDEA. Instead, the ALJ incorrectly concluded that Knight's January 2017 notice to Zaneski could not be considered because it was provided outside of the statute of limitations. AR 1028 ¶ 50. This conclusion misapplies the law. The statute of limitations only concerns the timeliness of the Parents' challenge to the "alleged action that forms the basis of the complaint." 20 U.S.C. § 1514(f)(3)(C). The "action" here is the April 25, 2017 reevaluation, not the teachers' concerns. The Parents timely challenged the reevaluation within two years, filing their complaint on April 16, 2019. The statute of limitations thus does not prevent the Parents from arguing that District was on notice before April 25, 2017 evaluation that it should have evaluated writing given the teachers' concerns. The ALJ provided no authority to support her decision and the Court is aware of none. The ALJ's decision also dismissed the teachers' concerns apparently because there was a February 16, 2017 meeting between the Parents and District where only reading was discussed. AR 1028 ¶ 50. But this does not excuse the failure to evaluate. It mere shows that the District ignored the teachers' concerns and did not share them with the Parents, who were otherwise unaware of the teachers' concerns. The Court therefore rejects the ALJ's conclusions and finds a procedural IDEA violation related to the April 2017 reevaluation.

The ALJ's decision also incorrectly suggests that the District satisfied the child-find requirement of the IDEA by providing reading interventions that secondarily helped with writing. AR 1028-29 ¶¶ 55-56. This rests on several erroneous conclusions. First, the ALJ wrongly believed that P.S.'s dysgraphia was merely secondary to his dyslexia, writing that Dr. Nelson "made her diagnosis secondary to the Student's dyslexia diagnoses." AR 1028 ¶ 56. But as Dr. Nelson made clear, P.S.'s dysgraphia is not merely secondary to dyslexia, it is a separate condition for which P.S. received an independent diagnosis. AR 1536. Because this is a separate disability, the District could not have satisfied its child-find duties under the IDEA merely by providing assistance with reading. And because writing was a separate concern, it should have been evaluated regardless of whether it was ultimately diagnosed as an independent disability. Second, the ALJ tried to excuse the District's failure to evaluate writing simply because of its comparative resources. The ALJ wrote that "Dr. Nelson persuasively testified that the ability of school districts to evaluate for writing disabilities in children with a reading disability is limited compared to the evaluative skill and tools she can employ." AR 1028 ¶ 55. But the fact that Dr. Nelson may be better at diagnosing dysgraphia than the District is no excuse for the District not to at least attempt to assess P.S.'s writing ability when it had notice of the teachers' concerns. The Court therefore rejects any reliance on these conclusions contained in the ALJ's decision.

The facts presented in this case track those in <u>Timothy O.</u>, where the Ninth Circuit found a procedural violation of the IDEA amounted to a denial of FAPE. In <u>Timothy O.</u> the school district had notice that the child showed signs of autistic behavior but chose not to formally assess the autism because one staff member believed his informal observations indicated that the child was not autistic. 822 F.3d at 1121-22. In both <u>Timothy O.</u> and the present case, the school district failed to assess a suspected disability on which it had notice. And while the district in

Timothy O. erroneously relied on staff's informal observation, here Zaneski simply appears to have ignored the concerns altogether. The District attempts to distinguish Timothy O. on the theory "that addressing [P.S.'s] dyslexia would likely resolve his writing issues, that P.S.'s writing fell within the average range for first and second grade students and that the few references to his struggles with writing did not warrant an evaluation." Resp. Br. at 21 (Dkt. No. 20 at 21). But this argument nowhere comes to terms with the fact that P.S.'s teachers and parents had identified writing as an area for disability evaluation and that no such evaluation was conducted. To satisfy the procedural requirements of the IDEA, the District had a duty to evaluate the suspected disability in writing and could not discharge that duty simply by hoping that P.S.'s writing difficulties would be ameliorated as a secondary benefit from the reading assistance the District provided.

   The Court is also unpersuaded by two cases on which the District relies to support the ALJ's decision. (See Resp. Br. at 15-16 (citing D.K. v. Abington Sch. Dist., 696 F.3d 233 (3rd Cir. 2012) and R.Z.C. v. North Shore Sch. Dist., 755 F. App'x 658 (9th Cir. 2018) (unpublished)).) First, the District relies on D.K. v. Abington Sch. Dist., 696 F.3d 233 (3rd Cir. 2012) to argue that a district can wait and see whether the student progresses before assessing a disability. The Ninth Circuit has not adopted this reasoning. See G.M. ex rel. G.M. v. Saddleback Valley Unified Sch. Dist., 583 F. App'x 702, 704 (9th Cir. 2014) (stating it has not adopted the D.K. child-find test). Nor is the Court convinced that such a rule could be squared with the child-find requirement of the IDEA as set out in the Ninth Circuit authority identified above. Second, the Court is not convinced that R.Z.C. supports affirming the ALJ's decision. In R.Z.C., the court found no procedural IDEA violation when the district concluded the child no longer met the criteria for special education where the child received average grades and demonstrated

"sufficient abilities in written expression." 755 F. App'x at 660-61. But here the issue is whether the District should have assessed P.S.'s writing difficulties when it had notice of the suspected disability. That procedural misstep cannot be excused merely because P.S. made progress in writing. And as the Parents correctly point out, P.S. remained <u>below</u> average in writing, a fact that stands in distinction to <u>R.Z.C.</u> The Court places no reliance on either <u>D.K.</u> or <u>R.Z.C.</u>

The Court also finds that the District violated the procedural requirements of the IDEA when it failed to evaluate P.S.'s writing by the Fall of 2017. In October 2017, P.S.'s second-grade teacher, Ball, wrote to another teacher that P.S. "has dyslexic/graphia issues" that may contribute to math difficulties. AR 1441. And on November 7, 2017, the IEP team discussed that: "Writing - pre to Draft writing (process) Edits/revision is super hard." AR 1461. This appears sufficient to have triggered the need for a reevaluation of writing. And, yet, the District waited to act until the parents retained a private specialist to test P.S., and, even then, waited many more months to conduct a new evaluation. This is another ground on which the Court finds the District violated the procedural IDEA rules. The Court also notes that the ALJ erroneously dismissed Ball's observation as an "off-hand comment" by someone who "is not trained to diagnose" dysgraphia. AR 1028 ¶ 51. But there is no technical requirement that the party identifying a suspected disability be trained to diagnose an underlying condition. The suspicion need only be nonfrivolous to trigger the duty to evaluate. See <u>Timothy O.</u>, 882 F.3d at 1121. The ALJ's decision to ignore this suspicion is erroneous as a matter of law. And, as the Parents note, the ALJ concluded that Ball had, in fact, identified P.S.'s writing as a concern when discussing the efforts she engaged took to "provide[] writing interventions in the general education classroom that garnered a positive response and improved the Student's writing." AR 1029 ¶ 51. The Court finds that the District continued to fail to meet the procedural requirements of the

IDEA through the Fall of 2017 and up until the implementation of the new IEP on April 30, 2018.

**D.     Procedural violation of IDEA denied FAPE**

The procedural violations show both that P.S. lost educational opportunities and P.S.'s parents were deprived of meaningfully participating in the IEP process. Both are bases on which to find a procedural violation of the IDEA denied P.S. of FAPE warranting an award in the Parents' favor. See N.B., 541 F.3d at 1207.

First, the record shows that P.S. lost educational opportunities as a result of the District's failure to evaluate P.S.'s suspected writing disability earlier given the strong likelihood that writing assistance would have been considered had it been tested. See Timothy O., 822 F.3d at 1124. Once the Parents had P.S. tested, Dr. Nelson readily concluded that P.S. suffers from both dysgraphia and dyslexia, meaning that P.S.'s difficulties in writing are not merely secondary to dyslexia. AR 1494. Dr. Nelson recommended "specialized instruction in writing, provided at least 2-3 days per week" to assist P.S. with writing. AR 1495. And when the District finally evaluated P.S.'s writing in April 2018, it too concluded that an IEP with similar interventions was necessary to address P.S.'s dysgraphia. There is thus a strong probability that P.S. would have been afforded writing assistance had he been tested. The record also shows that P.S. fell behind in writing during this same time period without any specific intervention. Dr. Nelson found P.S.'s "broad writing skills in the low average range . . . with [] scores falling at about the early first grade level for single-word spelling, and at the mid-first grade level for writing fluency and written expression." AR 1494. Dr. Nelson reached this conclusion despite the efforts of P.S.'s teachers' intervention in the general education setting, as the ALJ noted. AR 1029 ¶ 51. And Dr. Nelson also noted that P.S. suffered from anxiety that was "primarily related to or significantly exacerbated by [P.S.'s] learning challenges." AR 1494. In other words, P.S. not

only fell behind in writing, but also suffered from anxiety as a result of the unevaluated dysgraphia. Based on the record, the failure to assess writing deprived P.S. of educational opportunities and denied P.S. of FAPE from April 25, 2017 through April 30, 2018.

Second, the failure to evaluate writing violated the IDEA by depriving the Parents "of vital information necessary for them to meaningfully participate in the IEP process." Timothy O., 822 F.3d at 1126. The record shows that the parents advocated for P.S. to obtain additional assistance for writing as far back as June 2016. AR 1334. The District never fully responded to those concerns. And the District never disclosed P.S.'s teachers' concerns about his writing abilities that were communicated to Zaneski in January 2017. This limited the Parents' ability to advocate on P.S.'s behalf during the February 2017 meeting with the District to discuss the 2017 reevaluation. Nor did the Parents receive any rationale from Zaneski or the District as to why P.S.'s writing should not be evaluated despite these concerns. Similarly, the Parents were not aware of Ball's concerns about dysgraphia in the Fall of 2017. Instead, it was only after the Parents independently retained Dr. Nelson to evaluate and opine on P.S.'s writing that the District acted. By not providing the Parents with the teachers' concerns about writing or explaining why the District did not act on these concerns, the District denied the Parents of information necessary for them to advocate for P.S. This is an independent basis on which the Court finds that the procedural violation of the IDEA amounts to a denial of FAPE during the time in question.

**D.      Relief Requested**

Under the IDEA, the Court has broad equitable powers, including awarding attorneys' fees. 20 U.S.C. § 1415(i)(3)(B) (attorneys' fees). As relief for the IDEA violation and denial of

FAPE, the Parents request 60 hours of additional writing assistance and attorneys' fees. The Court agrees as to both requests.

First, the Court finds that additional writing instruction is a reasonable, equitable remedy for the District's failure to evaluate P.S.'s writing disability between April 2017 and April 2018. The record supports the notion that this is the most likely intervention the District would or should have given to P.S. had it evaluated writing by April 2017. The Court also finds that 60 hours of such instruction is reasonable and appropriate. The Parents arrive at 60 hours by multiplying the number of weekly hours of writing assistance included in the 2018 IEP by the number of weeks in the 2017-2018 school year. The Court finds this a persuasive means to fashion an equitable remedy for the writing assistance that P.S. did not receive between April 2017 and April 2018. The Court therefore awards 60 hours of writing instruction for P.S. But neither Party discusses how the 60 hours of instruction can be provided to P.S. given that he is no longer a student in the District. The Court therefore ORDERS the Parties to meet and confer to discuss how to structure the delivery of this benefit and to inform the Court of their proposed solution. The Parties are ORDERED to meet and confer and provide their proposed solution within 30 days of entry of this Order.

Second, the Court also grants the Parents leave to file a motion for attorney's fees for their successful appeal of the ALJ's decision on the one issue they attack. See 20 U.S.C. § 1415(i)(3)(B). Any such motion must be filed within 21 days of entry of this Order.

The clerk is ordered to provide copies of this order to all counsel.

Dated May 19, 2021.

*[signature]*

Marsha J. Pechman
United States Senior District Judge